## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NADER TURKI ALDOSSARI, on behalf** | : | |
| **of as parent and natural guardian of** | : | |
| **RAKAN NADAR ALDOSSARI,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH C. RIPP *et al.*,** | : | **No. 20-3187** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                                                   MAY 5, 2021

Subject matter jurisdiction derails many cases. Here, there are two such dead-end detours. Because the plaintiff cannot avoid either, this case must stop before it ever starts.

First and foremost, Article III, section 2 of the U.S. Constitution requires a plaintiff to demonstrate that he has standing—*i.e.*, that he is the proper party to bring the suit. Stated most simply, the plaintiff must show that he, and not someone else, is the one aggrieved. Here, apparently, the actually aggrieved parties are either a corporation or its deceased former principal, neither of whom is bringing the claims at issue; nor is any successor-in-interest pursuing any claim. Instead, Plaintiff Nader Turki Aldossari asks the Court to grant him standing because of injuries allegedly done to non-parties and non-beneficiaries to any contracts supposedly at issue. Mr. Aldossari argues for standing based on an inventive theory, namely, that a family member who is not a personal representative of an estate can bring the claims of the decedent as if the claims were his own. The Court declines to endorse these novel work-arounds in the face of the well-established constitutional standing guardrails.

The second impediment that Plaintiff cannot overcome is the broad limitation on the federal courts' power to hear claims brought against foreign states and their officials. That limitation,

1

which is grounded both in statute and in principles of comity to foreign states and our coordinate branches of government, precludes the Court's exercise of jurisdiction over these stated claims against the Kingdom of Saudi Arabia, its state-run oil authority Saudi Aramco, and Crown Prince Mohammed Bin Salman.

The Court dismisses all claims against all defendants for lack of standing.[1]

## BACKGROUND AND PROCEDURAL HISTORY

The roots of this case are found in a 1994 agreement to build and operate an oil refinery in the Caribbean island of St. Lucia.[2]

In September 1994, Trans Gulf entered into a memorandum of understanding with Transcontinental Oil and Financial Group of America, Inc. and Export Refinery Western Hemisphere, Ltd. in contemplation of a future agreement to operate an oil refinery in St. Lucia. It appears that Trans Gulf was owned and/or controlled by Plaintiff's father, Turki bin Farraj bin Nader ("Turki"), and that Transcontinental and Export were each owned or controlled by defendant Joseph Ripp. Mr. Aldossari alleges that Turki and Joseph Ripp also entered into an agreement a month later in October 1994, related to the refinery project. Am. Compl. ¶¶ 17-33. This October agreement appears to have re-allocated the ownership interests as between Turki's and Mr. Ripp's companies, with Mr. Ripp agreeing to transfer 10% of Transcontinental's interests in the refinery to Turki, in his capacity as president of Transcontinental.

Two months, later in Saudi Arabia, Trans Gulf, Transcontinental, Export and Saudi Est. for Development of Riyadh formally signed an "Ownership Agreement." *Id.* ¶¶ 18-19; Am.

---

[1]     This includes the former Crown Prince, Mohammed bin Nayef, who has not yet filed a responsive pleading, and Saudi Est. for Development of Riyadh, Export Refinery Western Hemisphere, Ltd., and Transcontinental Oil and Financial Group of America, Inc. who have not entered appearances in this case.

[2]     The Court takes judicial notice that St. Lucia is a foreign nation state that is not under the jurisdiction of the Eastern District of Pennsylvania. Fed. R. Evid. 201(c)(1).

Compl. at Ex. C ("Ownership Agreement"). Export agreed to develop, finance, and construct the refinery. Saudi Est. agreed, as a condition precedent, to obtain a "contract for the supply of crude oil from [Saudi Arabia] and/or Saudi Aramco" for at least 20 years. Ownership Agreement at 4, 6. Provided that Saudi Est. successfully secured a supply contract, the four parties to the Ownership Agreement would divide profits from the refinery in roughly equal shares. *Id.* at 6. The Ownership Agreement further provided that "any dispute between the parties shall be arbitrated in accordance with the rules and regulations then pertaining by the International Chamber of Commerce in Switzerland." *Id.* at 8.

The Kingdom of Saudi Arabia, the former and current Crown Princes, Saudi Aramco, and Plaintiff are not parties to this Ownership Agreement.

The Amended Complaint avers that Export eventually entered into a supply agreement at some unspecified time with Saudi Aramco and that Turki played a role in arranging that agreement. Am. Compl. ¶ 26. Sometime after that, Joseph Ripp and the former Crown Prince allegedly "cut Turki [ ] out of the deal." *Id.* ¶ 27. It appears that the "deal" referred to is the Ownership Agreement. That is because, in 1995, the "Crown Prince" allegedly notified Turki that, if the parties made "another deal in St. Lucia," "you will get your 24%." *Id.* ¶ 28.³ Mr. Aldossari then alleges that "future agreements and deals resulting in substantial profits transpired." *Id.* ¶ 29. There are no allegations that these agreements and deals involved any of the named defendants as parties.

Turki passed away in 1999. *Id.* ¶ 30. Mr. Aldossari alleges he spoke with the former Crown Prince in 2014, at which point, the former Crown Prince "acknowledged the agreement"

---

³       The Kingdom of Saudi Arabia and the Crown Prince each point out that it is unclear who the "Crown Prince" is in this allegation about events in 1995. The current Crown Prince defendant was nine years old at the time. The former Crown Prince defendant would not have that official title until some ten years later in 2015. Doc. No. 76-1 at 11; Doc. No. 78-1 at 12.

3

and Turki's "right to receive payment." *Id.* ¶ 31. Despite the former Crown Prince's alleged promise to "arrange for payment . . . in the coming weeks," no such payment was made. *Id.* Nor has the current Crown Prince arranged for whatever payments Mr. Aldossari claims is due. *Id.* ¶ 32. Mr. Aldossari instead alleges that the current Crown Prince arrested the former Crown Prince, seizing his assets as well. *Id.*

Mr. Aldossari claims an interest in the profits of the refinery endeavor on the sole ground that he is Turki's heir. Mr. Aldossari also appears to have assigned this claimed interest to his son, Rakan, a minor who is a U.S. resident. Neither Mr. Aldossari nor Rakan claim to represent Turki's estate or Trans Gulf. The suit is instead brought by Mr. Aldossari for Rakan's benefit.

Mr. Aldossari is proceeding against a host of defendants. He names the original parties to the Ownership Agreement as well as the Kingdom of Saudi Arabia, Saudi Aramco, the former and current Crown Princes, and Joseph Ripp.

The Kingdom, the current Crown Prince, Saudi Aramco[4], and Mr. Ripp have each filed a motion to dismiss.

## LEGAL STANDARD

A challenge to subject-matter jurisdiction may be raised at any time during the litigation. *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 34 (3d Cir. 2018). When a party questions the court's power to hear the case, the court must determine whether the challenge is a facial or factual attack. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).

A facial attack requires the court to consider "a claim on its face." It "asserts that it is insufficient to invoke subject matter jurisdiction . . . because, for example, . . . there is no indication of a diversity of citizenship among the parties[.]" *Id.* at 358. When a defendant advances a facial

---

[4]      Saudi Aramco also moves to strike portions of Mr. Aldossari's surreply to its motion to dismiss. Doc. No. 53.

4

attack, the "Court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). For that reason, the standard to evaluate a 12(b)(1) facial attack is similar to that used for evaluating a 12(b)(6) motion.

A factual attack, on the other hand, challenges the allegations underlying the plaintiff's assertion of jurisdiction. This can be through filing an answer or "otherwise presenting competing facts." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). As a result, for this analysis the Court may consider evidence outside of the pleadings. In this case, a plaintiff does not enjoy the same procedural safeguards as with a facial attack, and instead has the burden to establish that subject matter jurisdiction does exist. *Mortensen*, 549 F.2d at 891.

## DISCUSSION

The Kingdom of Saudi Arabia, the Crown Prince, and Saudi Aramco each challenge Mr. Aldossari's standing to assert claims against them. They also argue that they are immune from this particular suit and that no exception applies that would otherwise give this Court jurisdiction over Mr. Aldossari's claims. Both challenges are jurisdictional and thus could be raised *sua sponte*. *Meyer v. Del. Valley Lift Truck, Inc.*, 392 F. Supp. 3d 483, 494 (E.D. Pa. 2019). The Court will consider each in turn.

### I.    Mr. Aldossari's Standing

As a threshold matter, the Court must determine whether Mr. Aldossari has standing to assert the five common law counts in his Amended Complaint. "Although standing and merits questions may involve overlapping facts, standing is generally an inquiry about the plaintiff: is this the right person to bring this claim"? *Davis*, 824 F.3d at 348. The party seeking the exercise of jurisdiction bears the burden of establishing that he is the proper party.

Article III's "case or controversy" requirement means that the plaintiff must have a "personal stake in the outcome" of the litigation. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388,

397 (1980). The plaintiff must adequately establish he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An injury in fact exists when the plaintiff has suffered "an invasion of a legally protected interest," that is "concrete and particularized," and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Instead, "a plaintiff must demonstrate standing for each claim he seeks[.]" *Id.*[5]

## A. Count I (Breach of Contract)

Count I alleges a breach of the Ownership Agreement. Mr. Aldossari claims that Trans Gulf is owed 24% of the profits from the St. Lucia refinery, and he individually asserts a claim to those damages and for an accounting. But Mr. Aldossari does not assert any basis on which he has an interest in damages from the alleged breach. So, he cannot maintain this cause of action.

*First*, "[w]ith respect to breach of contract cases, a party is 'aggrieved' and therefore has standing to bring a breach of contract claim only if they are a party to the contract at issue." *Takeda Pharms. U.S.A., Inc. v. Spireas*, 400 F. Supp. 3d 185, 205 (E.D. Pa. 2019). That is because the plaintiff must have a concrete interest in the controversy. The Ownership Agreement was entered into by and between Saudi Est., Export, Transcontinental, and Trans Gulf. Am. Compl. Ex. C.[6]

---

[5]     Mr. Aldossari appears to rely on Saudi Arabian law, which, he maintains, grants him standing to bring his father's claims derivatively. This fundamentally misunderstands the nature of the justiciability inquiry under Article III of the U.S. Constitution. Saudi Arabia, no more than Congress or any state, cannot create a bare cause of action divorced from our Constitution's limitations on who can invoke the federal judicial power, when, and under what circumstances. *Lujan*, 504 U.S. at 576 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

[6]     The Court can consider any "document integral to or explicitly relied upon in the [Amended Complaint]." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Trans Gulf—the party supposedly entitled to the profits per the Agreement—is not a plaintiff in this case and Mr. Aldossari is not a party to the contract that divvies up the profits.

Mr. Aldossari does not describe any connection between him and the corporation. Nor is he seeking to sue in a representative capacity based on harms that are "peculiar" to the company. *Meyer*, 392 F. Supp. 3d at 494. Moreover, there is nothing that would show that Trans Gulf validly assigned its rights under the Ownership Agreement to him or that Mr. Aldossari is otherwise Trans Gulf's direct or indirect "successor." At best, Mr. Aldossari is the son of a former principal of the company. But this insufficient to establish any legal title to or interest in the claim, which is necessary to confer upon him standing to sue. His stated claim to damages allegedly due the corporation is too speculative to be an injury in fact. So, Mr. Aldossari lacks standing to sue in his own name.

*Second*, there is no indication anywhere here that Mr. Aldossari is an intended third-party beneficiary of the Ownership Agreement that would confer him rights under the contract. Pennsylvania recognizes some flexibility on the question of standing for non-parties who are intended third party beneficiaries. *Republic Servs. of Pa., LLC v. Caribbean Operators, LLC*, 301 F. Supp. 3d 468, 476 (E.D. Pa. 2018). But the category of third-party beneficiaries is narrowly defined. "[B]oth contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself." *Scarpitti v. Weborg*, 609 A.2d 147, 149 (Pa. 1992). Here, the Ownership Agreement does not state, expressly or suggestively, that either Mr. Aldossari or his father Turki were intended third-party beneficiaries of the contract.

This Court has been presented with no authority that permits a "non-party or non-beneficiary to challenge the existence or implementation of a contract." *Nationwide Ins. Indep. Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*, 518 F. App'x 58, 61 (3d Cir. 2013). The

Court is not otherwise aware of any such authority. So, both the deceased Turki and Mr. Aldossari lack standing to assert a breach of contract claim for profits allegedly owed to Trans Gulf. And because they lack standing, Mr. Aldossari's son—Turki's grandson—on whose behalf this suit is brought—likewise lacks standing.

Accordingly, the Court dismisses Count I for lack of standing.

## B. Count II (Breach of Contract)

In Count II, Mr. Aldossari again alleges a breach of the Ownership Agreement, as well as a breach of the October 1994 interest-transfer. For reasons already discussed in Section I.A., *supra*, the Court dismisses the portion of Count II that asserts a claim arising from the Ownership Agreement for lack of standing. This leaves only Mr. Aldossari's claim arising out of the October letter, which Mr. Aldossari contends was a matter between Mr. Ripp and Turki.

Even assuming that the interest transfer was one between individuals and not companies,[7] the Court still finds Mr. Aldossari lacks standing to sue. Mr. Aldossari is—again—not a party to this October 1994 agreement, and there is nothing on the face of the document that states that Mr. Aldossari is an intended third-party beneficiary of it.

To the extent that Mr. Aldossari tries to bring the claim on behalf of his late father, Turki, as the party in interest, Mr. Aldossari cannot maintain the action at present. Rule 17(a)(1) provides that he cannot sue on behalf of a real party in interest unless he is an executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has

---

[7]     Although not dispositive to the standing analysis, Court expresses doubt that the interest transfer document is a separate free-standing agreement, rather than a modification of the Ownership Agreement. That is because the interest transfer refers expressly to ownership interests in the St. Lucia refinery, the very profits that the Ownership Agreement contemplates allocating among the corporate entities. Moreover, an inspection of the plain text of the October transfer confirms that Mr. Ripp, in his official role as president, transferred a percentage of Transcontinental's holdings in the refinery to Trans Gulf. Am. Compl. Ex. D. So, it appears that Mr. Ripp signed the October transfer on behalf of one of his corporate entities.

been made for another's benefit, or a party authorized by statute. Fed. R. Civ. P. 17(a)(1). Neither Mr. Aldossari nor his son appear to be any of these things. And, critically, Mr. Aldossari is not asserting this claim as a personal representative of his father's estate, which would allow him to stand in his late father's shoes. Under established Pennsylvania law, "all actions that survive a decedent must be brought by or against the personal representative of the decedent's estate." *Prevish v. Nw. Med. Ctr. Oil City Campus*, 692 A.2d 192, 200 (Pa. Super. Ct. 1997), *aff'd*, 717 A.2d 1023 (Pa. 1998). So, Mr. Aldossari lacks standing to represent his father's estate at this time.

Instead, Mr. Aldossari, looking in a different generational direction, brings Count II on his behalf of his minor son. But the Amended Complaint alleges no harm to Mr. Aldossari or his son separate and apart from their claimed status as "heirs" and relations to Turki. This ancestral allegation alone is insufficient to establish that Mr. Aldossari has a "personal stake" in the alleged dispute and that the claimed injury is "particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

There are no allegations that Turki either gifted, in whole or in part, any interest in Trans Gulf to Mr. Aldossari during Turki's lifetime or bequeathed it upon his passing. For that matter, Mr. Aldossari is not the sole heir to Turki's estate. To the contrary, Exhibit A to the Complaint lists Turki's heirs, including his three wives, 12 sons, and seven daughters. Mr. Aldossari does not establish that his claim is superior to that of any other heir. For the same reason, Mr. Aldossari's "assignment of claim" of his purported rights to the profits from Trans Gulf to his son, Turki's grandson, is legally irrelevant to establishing an injury in fact, absent a showing that he had such a claim to assign in the first place. "Nothing will come of nothing."[8]

---

[8]     William Shakespeare, King Lear, act I, sc. I.

Because Mr. Aldossari has not met his burden of establishing his standing (or that of his son), this Court lacks subject matter jurisdiction over Count II.

## C. Count III (Quantum Meruit)

In Count III, Mr. Aldossari seeks damages on the grounds that Defendants were unjustly enriched as a result of Turki's services. He expressly claims that he is personally entitled to the "value of plaintiff's services and work." Am. Compl. ¶ 52. Again, without establishing an entitlement to the claim that is arguably held by Turki's estate, Mr. Aldossari argues it would be "unjust and unfair" for him not to receive the value of such work and services. But Mr. Aldossari's arguably disingenuous use of the word "plaintiff" to interchangeably refer to both his deceased father and his son Rakan does not overcome the fact that Mr. Aldossari is not proceeding on behalf of Turki's estate. Although he appears to plead that Turki suffered an actual injury because his (i.e., Turki's) efforts were not justly compensated, that does not establish that *Mr. Aldossari* was personally injured as would be necessary for him to have standing. Whatever the value of the claim, it belongs to Turki's estate, not to Mr. Aldossari or his son in their personal capacities.

## D. Count IV and V (Tortious Interference with Contractual Relations)

In Counts IV and V, Mr. Aldossari alleges that Mr. Ripp and the Crown Prince intentionally interfered with Turki's contractual relations to ensure that neither Turki's estate nor Trans Gulf received any profits. As is by now a refrain, Mr. Aldossari is not proceeding on behalf of either the estate or Trans Gulf,[9] nor is he a party to or third-party beneficiary of any of the agreements out of which a tortious interference claim could arise. *See Am. Cap. Acquisition Partners, LLC v. Fortigent, LLC*, No. CIV. 13-5571, 2014 WL 1210580, at \*4 (D.N.J. Mar. 24, 2014), *aff'd sub nom. Am. Cap. Acquisitions Partners LLC v. Fortigent LLC*, 595 F. App'x 113 (3d Cir. 2014)

---

[9]     Indeed, in his response, Mr. Aldossari admits that the Crown Prince "is attempting to avoid the proper claims of a young man [Rakan] for what was rightfully due his grandfather." Doc. No. 89 at 2.

(plaintiffs lacked standing because they failed to establish any damage to their own economic relationships separate from a non-parties' relationship); Restatement (Second) of Torts § 766 cmt. p (1979) ("The person protected by the rule stated in this Section is the specified person with whom the third person had a contract that the actor caused him not to perform.").

Because he has not established a legal entitlement or interest that would afford him standing to bring either claim for tortious interference, Mr. Aldossari and his son both lack standing to assert Counts IV and V. *See* Section I.C, *supra*.

Although the Court determines that Mr. Aldossari personally lacks standing to assert any of the five foregoing claims, the Court nevertheless will also consider the remaining jurisdictional arguments raised by Saudi Arabia, Saudi Aramco, and the Crown Prince. In particular, regardless of whether the personal representative of Turki's estate eventually may seek to bring claims arising from the facts presented here, the Court is compelled to address the Saudi defendants' immunity defense. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (directing courts to consider immunity "[a]t the threshold" of the case).

## II. Subject Matter Jurisdiction Over Saudi Arabia And Saudi Aramco

Both Saudi Arabia and Saudi Aramco argue dismissal is warranted because they are each immune from suit under the Foreign Sovereign Immunities Act of 1976. 28 U.S.C. §§ 1602 *et seq*. This Act provides "the sole basis for obtaining jurisdiction over a foreign state" in the federal courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Foreign states are presumptively immune unless an expressly enumerated exception applies. A "foreign state" within the meaning of the FSIA also includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(b).

The defendant bears the initial burden of making a prima facie showing that it is a sovereign state. *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir. 1993). Once sovereign

11

status is established, the burden then shifts to the plaintiff to establish that an exception to immunity applies. *Id.*

Mr. Aldossari does not dispute the obvious proposition that Saudi Arabia is a sovereign state. Am. Compl. ¶ 6. And he concedes that Saudi Aramco is an agency or instrumentality of a foreign state under the FSIA. *Id.* ¶ 8. So, the sole question is whether Mr. Aldossari has rebutted each of Saudi Arabia and Saudi Aramco's entitlement to immunity by showing an exception applies. Mr. Aldossari alleges that Saudi Arabia, Saudi Aramco, and the Crown Prince are "not immune from suit" but adds nothing more to substantiate this claim.[10]

Both Saudi Arabia and Saudi Aramco argue that no exceptions to immunity apply here.[11] *First*, they argue that they have not waived their immunity to suit explicitly or implicitly under 28 U.S.C. § 1605(a)(1). *Second*, they argue that the allegations in this case do not fall within the FSIA's commercial-activity exception. *Id.* § 1605(a)(2). The Court will address each exception in turn.

## A. No Basis to Imply A Waiver

A foreign state may explicitly or impliedly waive its immunity. Neither Saudi Arabia nor Saudi Aramco is a party to the Ownership Agreement. But even if they were, that agreement does not include any waiver provision. So, the Court rejects any argument that there is explicit waiver for either defendant.

Federal courts construe an implied waiver provision under Section 1605(a)(1) narrowly. *Popli v. Air India Airline*, No. CV 17-337, 2017 WL 1826499, at *4 (E.D. Pa. May 5, 2017) (citing

---

[10]    As discussed below, *see infra* Section III, any entitlement to immunity that the Crown Prince may enjoy does not derive from the FSIA. *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). That is because the FSIA does not govern immunity for officials acting on behalf of foreign states.

[11]    Saudi Arabia and Saudi Aramco are represented by different counsel and submitted their own motions to dismiss.

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (collecting cases)). Although the Third Circuit Court of Appeals has not directly addressed this issue, other circuits have not stretched to imply a waiver when the circumstances are not "unambiguous or unmistakable." *Shapiro*, 930 F.2d at 1017; *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338 (11th Cir. 2015) ("[A] foreign state expressly waives its right to immunity only where its intent to do so is clear and unambiguous."); *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 (5th Cir. 1993) (requiring "strong evidence" of a foreign state's intent to waive its immunity). Saudi Arabia and Saudi Aramco each affirmatively disclaim that they have waived their entitlement in their motions. This alone can be sufficient to find that the defendants did not implicitly waive their immunity.[12]

In his sur-reply to Saudi Aramco's motion, Mr. Aldossari asserted for the first time the claim that the King of Saudi Arabia had "effectively waived immunity for the Saudi Arabian government."[13] This alone is an improper use of the sur-reply.[14] To the extent sur-replies are appropriate, it is only when a "party seeks to respond to an argument raised for the first time by an opposing party." *Gentry v. Sikorsky Aircraft Corp.*, No. CV 18-1326, 2018 WL 6329147, at *2

---

[12]     Though not always directly helpful to understanding an issue, here the legislative history of the FSIA provides illustrations of narrow scenarios where federal courts found implied waivers, confirming the view that finding a waiver is not the default position: (1) "where a foreign state has agreed to arbitration in another country;" (2) "where a foreign state has agreed that the law of a particular country should govern a contract," or (3) "where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." H.R. Rep. 94-1487, at 18 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

[13]     Saudi Aramco moves to strike this new argument as untimely when this alleged basis for jurisdiction was "fully available for Plaintiff to argue in his opposition." Doc. No. 51. For the reasons that follow, the motion to strike is deemed moot. The Court has considered the arguments raised by the Kingdom in responding to the alleged waiver as sufficiently responsive to Mr. Aldossari's 11th hour argument on this point.

[14]     The Court's Pre-Trial and Trial Procedures plainly state that "surreply briefs are strongly discouraged unless it is apparent on the face of the submission that such additional briefing is necessary to rebut an issue or point of law not anticipated in or otherwise discussed in the initial briefs." *See* https://www.paed.uscourts.gov/documents/procedures/prapol2.pdf.

13

(E.D. Pa. Dec. 4, 2018). Saudi Aramco asserted a sovereign immunity defense in its initial moving papers. So, Mr. Aldossari was on notice of this legal issue at the time he filed his response in opposition to the pending motions. The Court will, however, address Mr. Aldossari's waiver argument for the simple reason Saudi Arabia specifically anticipated it in its motion. Anticipating Plaintiff's argument, Saudi Arabia submitted a declaration of an expert on principles of Saudi Arabian law. Because the Kingdom is making a factual attack on the Court's subject-matter jurisdiction, the Court can consider evidence outside of the pleadings. *Davis*, 824 F.3d at 346.

Mr. Aldossari contends that a 2015 article from *The International News* which supposedly quotes the Saudi King as saying that "members of the royal family are not above the law" suffices to roll back immunity worldwide for both the sovereign state and its nationally owned oil company. The Court cannot agree.

There are multiple problems immediately apparent with Mr. Aldossari's argument that preclude a finding that either defendant implied a waiver by virtue of this news article. As an initial matter, the King's supposed statement on its face speaks to immunity as to members of the royal family. There is nothing in the statement that purports to disclaim immunity for the *government* writ large or its agencies or instrumentalities, such as Saudi Aramco. Nor is there any indication that the statement is a waiver for suits brought in non-Saudi courts anywhere around the world. Indeed, the language of the statement expressly notes that a Saudi citizen can file a suit against a member of the royal family "here." The statement was made in Saudi Arabia. As Rodgers and Hammerstein once lyrically asked, "How far away, Philadelphia, PA?"[15] Here, the answer is many miles away.

Moreover, Saudi Arabia is a party to the United Nations Convention on Jurisdictional Immunities of States and Their Property and acceded to this treaty in 2010. United Nations

---

[15]     Rodgers and Hammerstein, My Girl Back Home, *South Pacific* (20th Cent. Fox 1958).

General Assembly, Convention on Jurisdictional Immunities of States and Their Property, Res. 59/38, Art. 5 (Dec. 2, 2004), https://treaties.un.org/pages/ShowMTDSGDetails.aspx?src=UNTSONLINE&tabid=2&mmtds_n o=III-13&chapter=3&lang=en (last accessed May 4, 2021). This Convention codifies customary international law regarding state immunity and establishes that Saudi Arabia maintains its claim to sovereign immunity. Mr. Aldossari has not offered any compelling rebuttal that leads the Court to find Saudi Arabia seemingly renounced its sovereign immunity in a news article, rather than through established domestic and international processes to amend a treaty.

Given the presumption against implying a waiver absent compelling evidence, the Court declines Mr. Aldossari's invitation to expand a statement addressing third-parties' capacity to be sued in foreign courts. The plain text of the King's hearsay statement prevents such a reading and holding otherwise runs counter to the doctrine of international comity.

## B. Commercial-Activity Exception Does Not Apply

The commercial-activity exception under the FSIA applies to an "action [that] is based upon" either (i) "commercial activity carried on in the United States by the foreign state," (ii) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," or (iii) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Commercial activity for purposes of the Act is either "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d).

As for the first two exceptions of § 1605(a)(2), within this Circuit, a court must first determine whether there is a "sufficient jurisdictional connection or nexus between the commercial activity and the United States." *Fed. Ins.*, 12 F.3d at 1286. The court then considers whether there

is a "substantive connection or nexus between the commercial activity and the subject matter of the cause of action." *Id.*

As for the "direct effect" exception, the inquiry is whether the defendant's commercial activities which form the basis of plaintiff's claim had a direct effect in the United States. Although the effect need not be substantial, and plaintiff is not put to a daunting challenge, there must be a linear consequence of the defendant's alleged conduct. *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 664 (D.C. Cir. 2010). That said, the focus is not simply whether the foreign state or its agents or instrumentalities have engaged in "any commercial activities" with a connection to the United States. Such a minimalist inquiry would too broadly confer subject matter jurisdiction in derogation of the FSIA.

### i.    *Saudi Arabia's Commercial Activity*

As a threshold matter, the Kingdom notes (correctly) that the Amended Complaint fails to allege any connection between Saudi Arabia and the United States. So, the pleading fails to establish jurisdiction at the first step under *Fed. Ins.* 12 F.3d at 1286. Indeed, the Amended Complaint does not plead any facts which would establish a nexus with the United States. The alleged Ownership Agreement, to which neither the Kingdom nor its agent or instrumentality, Saudi Aramco, are parties, was entered into in Saudi Arabia. The place of performance for the Ownership Agreement is in St. Lucia. No operative activity—let alone by Saudi Arabia—is alleged to have taken place anywhere in the United States by either of these defendants.

Nor can the claim survive using the "direct effect" exception to immunity as an alternative. To do so, Mr. Aldossari would have to show that the direct effect in the United States "follow[s] 'as an immediate consequence' of [the defendant's] commercial activity" and is "causally linked" to the plaintiff's claim. *Id.* at 1291 (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 618

(1992)). The failure to allege what commercial activities the Kingdom caused or effected in the United States is a glaring deficiency.

There are no allegations that Saudi Arabia assumed any duties or obligations that would be performed in the United States. As best as the Court understands it, any claims against Saudi Arabia arise from an alleged oil supply contract between its instrumentality, Saudi Aramco, and Export, a British Virgin Islands corporation, that would impact the development of an oil refinery in St. Lucia, itself governed by a separate agreement. But there are not even any allegations that Saudi Arabia or its instrumentality breached any obligations under this oil supply contract. Whatever effects may trickle down to the United States are far too attenuated or speculative here to satisfy an exception under Section 1605(a)(2).

To the extent Mr. Aldossari asserts an agency relationship between Saudi Arabia and the former Crown Prince, Am. Compl. ¶ 13, again, there are no allegations that the former Crown Prince either carried on any commercial activities in the United States or that any such activities abroad had a meaningful direct effect in the United States. On such tenuous grounds as are alleged here, there is neither an abrogation of sovereign immunity nor an applicable exception to make the Kingdom (or the former Crown Prince, for that matter) a proper defendant.

The Pennsylvania residency of Mr. Aldossari's son, on whose behalf he brings a claim, does not constitute a means to prove a direct effect. As explained in Section I, *supra*, Mr. Aldossari's son, who is a United States citizen, is not a proper plaintiff. But even assuming that Mr. Aldossari's son did have standing, his U.S.-based residency does not turn an otherwise at best indirect effect into a direct effect for purposes of the FSIA. "Mere financial loss in the United States caused by commercial activity abroad" will not abrogate sovereign immunity. *S. Seafood Co. v. Holt Cargo Sys., Inc.*, No. CIV.A. 96-5217, 1997 WL 539763, at *6 (E.D. Pa. Aug. 11, 1997). Moreover, the D.C. Circuit Court of Appeals considered—and rejected—such an effect of

17

residency, and this Court finds that court's reasoning persuasive. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 38-39 (D.C. Cir. 2014). Thus, an aggrieved plaintiff alleging breach of contract, where the place of performance is *not* in the United States, does not create a "direct effect" by having or taking up residency in the United States. Interpreting the FSIA this way would otherwise "create an incentive for every breach of contract victim in the world to move to the United States, demand payment here, and then sue alleging a direct effect of nonpayment in the United States." *Id.* at 39. The FSIA does not—and neither does this Court—envision turning the federal courts into "small international courts of claims." *Verlinden*, 461 U.S. at 490 (internal quotation marks omitted). That is why Congress enacted "substantive provisions requiring some form of substantial contact with the United States." *Id.*

Because the Court finds that it lacks subject matter jurisdiction over the Kingdom, it dismisses it from this action.

### ii. *Saudi Aramco's Commercial Activity*

Saudi Aramco also disputes that Plaintiff has shown that its alleged conduct constitutes "commercial activity" for any of the Section 1605(a)(2) exceptions to apply. Mr. Aldossari asserts two grounds on which the Court has subject matter jurisdiction over Saudi Aramco. First, Saudi Aramco participates in the international oil market. Second, the Ownership Agreement which was entered into by Mr. Ripp, a Pennsylvania resident, on behalf of Transcontinental, a Delaware corporation, constitutes a "direct effect" in the United States. (Mr. Aldossari does not address the fact that Saudi Aramco is not party to this agreement.) The Court cannot agree with Mr. Aldossari's expansive interpretation of its jurisdiction.

*First*, Mr. Aldossari does not establish that his claims are "based upon" Saudi Aramco's commercial activity conducted in the United States. He pleads that Saudi Aramco engages in "routine, regular, and substantial commercial activities in the United States concerning the

18

international oil market." Doc. No. 47 at 13. Whether Saudi Aramco participates in any commercial activity in the United States—which it admittedly does—is not the proper inquiry. As the Supreme Court explains, the phrase "based upon" as used in the FSIA is "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). Put differently, the "gravamen" of the suit must be based upon Saudi Aramco's commercial conduct in the United States. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015); *Fed. Ins.*, 12 F.3d at 1287 ("[T]he cause of action must arise directly from the defendant's commercial activities in the United States in order for the first clause of the commercial activity exception to apply.").

With this understanding, the Court must reject Mr. Aldossari's first jurisdictional argument. Mr. Aldossari has, at best, established that Saudi Aramco engages in domestic commercial activities. But he fails to link any such domestic commercial activity to any element of any of his claims, as is necessary under *Nelson*. Generalized allegations about Saudi Aramco's commercial activities in the United States as part of the international oil market are legally irrelevant to Mr. Aldossari's claim for profits under the Ownership Agreement, to which Saudi Aramco is not a signatory.

In his response to the motion, Mr. Aldossari attaches a document purporting to be a side agreement between the Crown Prince and Saudi Aramco for the latter to supply oil to a refinery in St. Lucia. Saudi Aramco objects to the inclusion of these new documents. Because these new documents are not referred to in the Amended Complaint and are not matters of public record, they are indeed matters quite plainly outside of the pleadings. *Rose v. Bartle*, 71 F.2d 331, 339 n.3 (3d Cir. 1989). And the Court may disregard these untimely additions to the analysis at this point. But even if the Court were to consider these new features to Plaintiff's array, they would still fail to

establish that the claims at issue are based on Saudi Aramco's commercial activity "carried on in the United States." So, this exception to sovereign immunity is not satisfied.

*Second*, Mr. Aldossari's efforts to satisfy the "direct effect" prong of 28 U.S.C. § 1605(a)(2) likewise falter. To explain why, it is useful to contrast this case with the leading case on the meaning of "direct effect"—*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619 (1992). The Supreme Court considered whether Argentina's delay in paying certain bonds constituted a direct effect in the United States. The bond contracts to which Argentina was a party specified New York as the place of performance. Argentina had appointed a financial agent in New York and had previously made payments to the New York accounts owned by the bondholders. *Id.* at 619. So, when Argentina breached its contracts with the bondholders by failing to make timely payments to "a New York bank," its conduct was held to have caused a direct effect for purposes of the commercial activity exception. *Id.*

*Weltover* stands for the proposition that place of performance is a key inquiry for direct effect cases involving an alleged breach of contract. "That approach follows from the text and purpose of the FSIA." *Odhiambo*, 764 F.3d at 38. Stated simply, a breach of a contract which selects the United States as the place of performance will cause a "direct effect."

Here, Mr. Aldossari alleges that the Ownership Agreement—to which Saudi Aramco is not even a signatory—was signed by Mr. Ripp, a Pennsylvania resident. Mr. Ripp's residency alone is far from sufficient for the purpose Mr. Aldossari ascribes to it. The Ownership Agreement was signed in Saudi Arabia with St. Lucia as the intended place of performance. Doc. No. 47 at 17. Similarly, the side agreement between the Crown Prince and Saudi Aramco that Mr. Aldossari presented for the first time in his response does not select the United States as a place of performance either. So, performance under that agreement can cause, at most, an indirect effect in the United States.

20

In the Court's view, Mr. Aldossari's interpretation of the FSIA would render immunity based on commercial activities a nullity. It would subject foreign states to the Court's jurisdiction without establishing the requisite nexus to the United States. Such an argument is unsupported by the plain text of the statute, jurisprudence, and common sense. On the facts as alleged, the Court cannot find that it has jurisdiction over Saudi Aramco based on the FSIA commercial-activity exception. So, it dismisses Saudi Aramco from this case.

## III. Subject Matter Jurisdiction Over Crown Prince Mohammed Bin Salman

The Crown Prince also moves for dismissal of the sole count against him on the grounds that he is entitled to immunity. As a threshold matter, the Foreign Sovereign Immunities Act does not itself govern immunity for officials acting on behalf of foreign states. *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). Rather, immunity for foreign officials is governed by common law which recognizes two forms: head-of-state and conduct-based immunity. *Id.* at 325. The Crown Prince asserts he is entitled to both.[16]

In *The Schooner Exchange v. McFaddon* 11 U.S. (7 Cranch) 116 (1812), the Supreme Court announced the principle that foreign sovereigns are virtually absolutely immune. The Court, however, emphasized that foreign sovereign immunity is a matter of grace extended by the political branches and not the Constitution. *Verlinden*, 461 U.S. at 486. Because of the Executive Branch's

---

[16] Mr. Aldossari contends, as he did for both the Kingdom and Saudi Aramco, that the Saudi King waived sovereign immunity for all members of the royal family and entities. Doc. No. 89 at 7. In support he attaches a "Legal Advice Declaration," Doc. No. 89-2, and a screenshot from a video posted on YouTube of a press conference involving the King, Doc. No. 89-3. Waivers of immunity are to be construed narrowly. But, as previously stated, even if the Court credits Mr. Aldossari's interpretation of the King's news publication statement and reads it broadly, it applies by its terms to effect a waiver in only a domestic Saudi forum. Doc. No. 89-3 ("*But here*, any citizen can file lawsuits against the King, Crown Prince, or other members of the Royal Family."). So, neither exhibit provides authority that a domestic sovereign immunity waiver in *Saudi* courts expressly extends, or was intended to extend, to extra-territorial claims brought in a United States federal court. This reading further comports with the inherent dignitary interests in sovereign-immunity doctrines generally. *Cf. Alden v. Maine*, 527 U.S. 706, 709 (1999) ("[A] sovereign's immunity in its own courts has always been understood to be within the sole control of the sovereign itself.").

21

role in foreign policy and disinclination to antagonize or contradict the Executive's ordering of foreign affairs, federal courts typically defer to the Executive Branch as to whether to exercise jurisdiction over foreign sovereigns. *Id.*; *United States v. Lee*, 106 U.S. 196, 209 (1882) ("In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.").

Courts now apply a "two-step procedure developed for resolving a foreign state's claim of sovereign immunity." *Samantar*, 560 U.S. at 311. As an initial matter, the foreign state can request a "suggestion of immunity" from the State Department. *Id.*; *Ex Parte Peru*, 318 U.S. 578, 581 (1943). If that request is granted, then the court should defer to the Executive's suggestion and decline to exercise jurisdiction. "[I]n the absence of recognition of the immunity by the Department of State, a district court has authority to decide for itself whether all the requisites for such immunity existed." *Samantar*, 560 U.S. at 311 (cleaned up). "In such a case the court will inquire whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945). Although this two-step procedure emerged to handle assertions of sovereign immunity, it likewise applies in the rarer case when a foreign official claims such an entitlement. *Samantar*, 560 U.S. at 311.

It appears that the Crown Prince has not requested a suggestion of immunity nor has the State Department issued one.[17] The Crown Prince has not requested this Court stay its determination of his entitlement to immunity on the grounds that a requested suggestion of

---

[17] The Crown Prince is a named defendant in pending litigation in the District of Columbia. *Aljabri v. Bin Salman Bin Abdulaziz Al Saud*, No. 1:20-cv-2146 (D.D.C. Aug. 6, 2020). In that case, "Saudi Arabia's Embassy has already requested a suggestion of immunity from the State Department with respect to the Crown Prince." Doc. No. 92. The State Department has taken the Embassy's request under consideration. As of yet, at least according to the publicly available record, it has not issued any suggestion to that district court.

immunity remains pending. Nor, to be clear, has this Court requested an opinion from the State Department.

## A. Conduct Based Immunity

Absent a suggestion of immunity, the Court is authorized to decide whether all the requisites for conduct-based official immunity exists. *Samantar*, 560 U.S. at 311-12. Conduct-based immunity or functional immunity shields an individual from legal consequences for certain acts "because those acts are considered acts of the state, rather than acts of the individual." Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61, 63 (2010). This form of immunity extends protection well beyond an individual leaving office, in contrast to status-based immunity which attaches by virtue of the individual occupying a particular office.

Neither the Supreme Court nor the Third Circuit Court of Appeals has outlined how a court determines when a defendant is entitled to conduct based immunity. The Crown Prince suggests two methods, both of which he asserts lead to the same result.

The first approach asks whether it is "the established policy of the State Department to recognize the asserted ground of immunity." *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *5 (D.D.C. Mar. 31, 2020), *appeal pending*, No. 20-7040 (D.C. Cir. argued Feb. 26, 2021) (citing *Samantar*, 560 U.S. at 312). This was the common law inquiry prior to the enactment of the FSIA when a foreign state, and, in the rare case, a foreign official, asserted a claim of immunity. *Samantar*, 560 U.S. at 312 (collecting cases). The FSIA supplanted the common law as to foreign state's immunity claim. But, because *Samantar* held that the FSIA does not address claims from foreign officials, the Court may continue the common law practice of looking to the State Department's settled policy.

23

The second approach applies the three-element test set forth in Restatement (Second) of Foreign Relations Law of the United States § 66(f). Immunity requires a finding that (1) the defendant "is a public minister, official, or agent of the foreign state"; (2) the defendant performed the acts in his "official capacity"; and (3) that the court's exercise of jurisdiction would "serve to enforce a rule of law against the foreign state." *Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020). That said, the Supreme Court expressed "no view on whether Restatement § 66 correctly sets out the scope of the common-law immunity applicable to current or former foreign officials." *Samantar*, 560 U.S. at 322 n.15.

Absent more precedential direction, the Court will apply both tests to determine whether the Crown Prince is entitled to conduct-based immunity for acts allegedly taken. Ultimately, both tests do yield the same result, as the Crown Prince argues.

### i. State Department Test

The State Department's established policy adopts the principle of customary international law that "a foreign official enjoys immunity from suit based upon acts taken in an official capacity." Office of the Legal Advisor, U.S. Dep't of State, Digest of United States Practice in International Law (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3), at 426;[18] *see also Actions Against Foreigners*, 1 Op. Att'y Gen. 81, 81 (1797) ("[A] person acting under a commission from

---

[18]     In recent suits against foreign officials, the State Department has reiterated its position when filing suggestions of immunity. "[A]cts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity." Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice at 1, *docketed at Rosenberg v. Lashkar-e-Taiba*, No. 1:10-cv-05381-DLI-CLP (E.D.N.Y. Dec 17, 2012), ECF No. 35-1; *Scherr v. Lashkar-e-Taiba*, No. 1:10-cv-05382 (E.D.N.Y. Dec. 17, 2012), ECF No. 25; *Chroman v. Lashkar-e-Taiba*, No. 1:10-cv-05448 (E.D.N.Y. Dec. 17, 2012), ECF No. 28; *Ragsdale v. Lashkar-e-Taiba*, No. 1:11-cv-03893 (E.D.N.Y. Dec. 17, 2012), ECF No. 19; *see also* Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice at 1, *docketed at Doe v. Zedillo Ponce de Leon*, No. 3:11-cv-01433-AWT, ECF No. 38-1 (D. Conn Sept. 16, 2011) ("In a case involving conduct-based immunity . . . the Department of State generally presumes that actions taken by a foreign official exercising the powers of his office were taken in his official capacity.").

24

the sovereign of a foreign nation is not amenable for what he does in pursuance of his commission, to any judiciary tribunal in the United States.").

Mr. Aldossari's sole claim against the Crown Prince is based on the allegation that the Crown Prince placed the former Crown Prince under house arrest, thereby preventing the former Crown Prince from distributing proceeds allegedly due to Turki and/or Trans Gulf. Am. Compl. ¶¶ 32, 62. It is this alleged conduct that Mr. Aldossari asserts gives rise to a claim for intentional interference with contractual relations.

The Crown Prince does not concede this conduct but maintains that, even if it occurred, it would be an exercise of his official powers. The Court has been presented with no information to permit any other conclusion.

Certain guidance on this issue can be gleaned from other circuit courts of appeals. On remand from the Supreme Court, the Fourth Circuit Court of Appeals traced a foreign official's entitlement to immunity in the common law and what is meant by "official acts." The official may assert immunity for those acts "performed within the scope of his duty" but not for "private acts that are not arguably attributable to the state, such as drug possession or fraud." *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (post-remand). Moreover, "mere allegations of illegality do not serve to render an action unofficial for purposes of foreign official immunity." *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 249 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012).

In his roles as Deputy Prime Minister, Minister of Defense, and Chairman of the Council of Political and Security Affairs,[19] the Crown Prince represents that he oversees criminal prosecutions and national security. "Exercise of the powers of police and penal officers" is conduct

---

[19]   Doc. Nos. 77-1, 77-2, 77-3 (Royal Decrees appointing the Crown Prince to Deputy Prime Minister, Minister of Defense, and Chairman of the Council of Political and Security Affairs).

25

that is "peculiarly sovereign in nature." *Nelson*, 507 U.S. at 361; *see also McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (defining official action as "conduct that is by nature distinctly sovereign, *i.e.*, conduct that cannot be undertaken by a private individual or entity"). An executive decision to conduct a criminal investigation, including ordering an arrest and directing an asset seizure, likewise is one that can only be made by one acting with official authority. Indeed, Mr. Aldossari appears to concede as much. He pleads that the Crown Prince did not engage in the alleged conduct *until* he became the Crown Prince. Am. Compl. ¶ 32.

The Court will not delve further into whether the Kingdom of Saudi Arabia embraces the Crown Prince's actions, whatever the Crown Prince's motives, as its own. But it is satisfied that an official's exercise of police powers against its own citizens that has not been disavowed by the sovereign is conduct that is official in nature, even if the indirect effects of such official acts may result in private losses. *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 232 (D.D.C. 2018), *aff'd*, No. 18-7170, 2019 WL 668339 (D.C. Cir. Feb. 15, 2019), *and aff'd sub nom. Doe v. Buratai*, 792 F. App'x 6 (D.C. Cir. 2019) ("[S]uits against officers in their personal capacities must pertain to private action[s],—that is, to actions that exceed the scope of authority vested in that official so that the official cannot be said to have acted on behalf of the state.") (internal citations omitted). Because such conduct is arguably attributable to the sovereign state, for purposes here the Crown Prince's alleged acts were performed as part of his duty as a government official.

Mr. Aldossari appears to allege that the Crown Prince's arrest of his predecessor is a violation of *jus cogens*. *Jus cogens*, or peremptory norms in international law, prohibit crimes against humanity, war crimes, extrajudicial killing, human trafficking and genocide. Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331. By definition, *jus cogens* violations are those that are not "officially authorized by the [s]overeign." *Yousuf*, 699

26

F.3d at 776. Mr. Aldossari contends that the Court should apply the Fourth Circuit's holding that foreign official immunity does not extend to such violations. *Id.*

But that request in the context of this case goes beyond the Fourth Circuit's ruling. There, the *Yousuf* court had received a suggestion of non-immunity from the State Department which noted that the defendant had "no currently recognized government to request immunity on his behalf" and he was a "U.S. legal permanent resident" and thus subject to the court's jurisdiction. *Id.* at 777. So, "the defendant was never given immunity in the first place." *Dogan v. Barak*, 932 F.3d 888, 897 (9th Cir. 2019) (contrasting *Yousuf* and holding defendant was entitled to foreign official immunity where alleged conduct was at the direction of the Israeli Prime Minister and the State Department issued a suggestion of immunity). The different results reached by the Fourth and Ninth Circuits are best reconciled in terms of whether the foreign sovereign had either ratified the official's alleged conduct and/or whether the State Department had issued a suggestion of immunity. As noted, a request to the State Department is actually pending in this other case. So, as far as the Court can tell, Saudi Arabia has never explicitly disavowed the Crown Prince's conduct.

Regardless, Mr. Aldossari is hardly the proper complainant. At most, his father and his father's company lost money. Mr. Aldossari was not tortured, kidnapped, intimidated, or otherwise threatened. His invocation of this principle ostensibly on another's behalf is, at most, an un-cogent approach to *jus cogens* that merits no further elaboration here.

### ii. *Restatement Test*

The Restatement Test as applied to the facts here yields the same result. The Court is satisfied that the Crown Prince qualifies as "public minister, official, or agent" for purposes of the first element. (Mr. Aldossari does not dispute that the Crown Prince is an official. Am. Compl. ¶ 11.) And the Court likewise finds that the acts allegedly performed by the Crown Prince alleged

27

in the Amended Complaint were performed in his official capacity. *See supra* Section III.A.i. So, the Court finds that the first two elements of the Restatement test are met. The question remains whether the Crown Prince can establish that the Court's exercise of jurisdiction is tantamount to enforcing a rule of law against Saudi Arabia itself. Restatement § 66(f). Put differently, immunity is warranted "when a judgment against the official would bind (or be enforceable against) the foreign state." *Lewis*, 918 F.3d at 146. The Third Circuit Court of Appeals has not yet addressed how this factor should be applied.

Crediting Mr. Aldossari's allegations that the Crown Prince arrested the former Crown Prince and that the latter's assets were seized, such conduct is arguably attributable to the foreign state. By arguing that the Crown Prince is not entitled to immunity, Mr. Aldossari asks the Court to find that the acts allegedly done by the Crown Prince in supposedly arresting the former Crown Prince and seizing his assets were not done on behalf of the Kingdom of Saudi Arabia. The Court cannot agree. Declining to find immunity means that this Court must adjudicate the Crown Prince's exercise of alleged authority to arrest pursuant to a Royal Decree—which has the effect of enforcing a rule of law against Saudi Arabia. That the Court is not prepared to do.

Because the Court finds that all elements of the Restatement test are met here, the Court finds, as a matter of common law, that the Crown Prince is entitled to foreign official conduct-based immunity. Accordingly, the Court dismisses the Crown Prince from this suit.[20]

---

[20]     The Court also similarly dismisses the former Crown Prince from this action. *United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000) (a court may *sua sponte* consider the jurisdictional bar of sovereign immunity). He is immune from the Court's jurisdiction on the "separate ground that plaintiff has explicitly predicated [his] liability on official acts." *Weiming Chen v. Ying-jeou Ma*, No. 12 CIV. 5232 NRB, 2013 WL 4437607, at *3 (S.D.N.Y. Aug. 19, 2013) (court lacked jurisdiction to adjudicate contractual claims involving President of Taiwan who was entitled to immunity for acts performed in his official capacity); *accord Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971) (admitting that the foreign official defendant was "at all relevant times" an "agent of the defendant Spanish Government" was basis to dispose of claim). Here, Mr. Aldossari expressly concedes that "at all times relevant to the [Amended] [C]omplaint," the former Crown Prince "was acting on behalf of and as agent for the Kingdom of Saudi Arabia." Am. Compl. ¶ 12. So, whatever alleged commercial conduct the former Crown Prince engaged

28

## B. Head of State Immunity

Head of state immunity is status based and provides protection for the current head of state so long as the individual is in office. *Sikhs for Just. v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014); Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d at 62 ("[S]tatus-based immunities . . . enable certain incumbent foreign officials to perform their duties unencumbered by legal proceedings . . . ."). By conferring upon the head of state the same protection as the state itself, head-of-state immunity derives from customary notions of sovereign equality and comity. Ved P. Nanda and David K. Pansius, 1 *Litigation of International Disputes in U.S. Courts* § 4:2; *Yousuf*, 699 F.3d at 768-69; Restatement (Second) of Foreign Relations Law § 66(b) (1965).

Whether to recognize a head of state is best left to the Executive for reasons similar to those outlined above. It derives from the Court's considered judgment that the Executive has the sole power under Article II, section 3 of the Constitution to "receive ambassadors"—and by extension, to recognize foreign governments and their heads of state. *See In re Muir*, 254 U.S. 522, 532-33 (1921) ("The reasons underlying [deference to the Executive] are as applicable and cogent now as in the beginning, and are sufficiently indicated by observing that it makes for better international relations, conforms to diplomatic usage in other matters, accords to the Executive Department the respect rightly due to it, and tends to promote harmony of action and uniformity of decision."); Louis Henkin, *Constitutionalism, Democracy, and Foreign Affairs* 32 (1990). Courts are reluctant to declare that an individual is a "head of state" absent some indication from the political branches. Judicial resolution of that question leads courts "into the murky waters of foreign policy, implicating complex problems that the judiciary is ill equipped to handle." *Singh*, 64 F. Supp. 3d

---

in was done on behalf of a sovereign state. *Weiming Chen*, 2013 WL 4437607, at *4. And, Mr. Aldossari has not alleged that the former Crown Prince's specific activities were somehow *ultra vires*.

at 194. This Court will adhere to the lines delineating the balanced powers of the three co-equal branches of our government, as the Court would, of course, expect these other branches to do in return.

The Crown Prince asserts an entitlement to head of state immunity on two grounds: that he is the Heir Apparent to the throne and that he holds "high-ranking office" within the Saudi government. As to the former, he relies on a 1978 case wherein the District of Ohio declined to exercise jurisdiction over the Prince of Wales. *Kilroy v. Charles Philip Arthur George Windsor*, No. C 78-291, 1978 U.S. Dist. LEXIS 20419, *3 (N.D. Ohio Dec. 7, 1978). But in that case the court had the benefit of the State Department's suggestion of immunity "recogniz[ing] and allow[ing] the immunity of the Prince of Wales from the jurisdiction of the United States District Court in this action." *Id.* The court decided to defer to the Executive's suggestion.

As to the latter, the Crown Prince relies on customary international law that extends head of state immunity not only to the literal head of state but other "holders of high-ranking office." *Yousuf*, 699 F.3d at 769 n.2. But there is no suggestion that the Executive has yet extended this immunity to a Deputy Prime Minister or Minster of Defense—positions that the Crown Prince currently holds.

Here, not only has Saudi Arabia not requested a suggestion of immunity, as mentioned above, its request for a suggestion of immunity in a separate suit is still pending. In this circumstance, the Court has the authority to determine whether the Crown Prince is entitled to head of state immunity. But it declines to reach that issue when it has already found that the Crown Prince is entitled to conduct-based immunity. *See supra* Section III.A.

To be sure, the Court professes no power of foresight as to what the State Department may ultimately suggest.[21] But because it has already determined that the Crown Prince's actions entitle him to conduct-based immunity, the Court need not anticipate the Executive's actions.

## CONCLUSION

Because the Court determines that it lacks subject matter jurisdiction, it does not consider defendants' remaining arguments. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[21]    Of course, the State Department may "wish to refrain from taking an official position, particularly at a moment that would be dictated by the development of private litigation but might be inopportune diplomatically." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436 (1964).